## BUFORD *v.* HOUTZ.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF UTAH.

No. 711. Submitted January 6, 1890. — Decided February 3, 1890.

There is an implied license, growing out of the custom of nearly one hundred years, that the public lands of the United States, especially those in which the native grasses are adapted to the growth and fattening of domestic animals, shall be free to the people who seek to use them, where they are left open and unenclosed, and no act of the government forbids their use.

During the progress of the settlement of the newer parts of the country the rule that the owner of domestic animals should keep them confined within his own grounds, and should be liable for their trespasses upon unenclosed land of his neighbor, has nowhere prevailed; but, on the contrary, his right to permit them, when not dangerous, to run at large, without responsibility for their getting upon such land of his neighbor, has been universally conceded, and is a part of the statute law of Utah. Comp. Laws, § 2234.

IN EQUITY. The bill was dismissed and the plaintiffs appealed. The case is stated in the opinion.

*Mr. M. Kirkpatrick* for appellants.

*Mr. Joseph L. Rawlins* (with whom were *Mr. James N. Kimball* and *Mr. Ogden Hiles*) for appellees.

MR. JUSTICE MILLER delivered the opinion of the court.

This is an appeal from the Supreme Court of the Territory of Utah.

The bill was originally filed by the appellants in the Third Judicial District Court of Utah Territory in and for Salt Lake County, and in that court a demurrer was filed setting forth two grounds of objection to the bill; first, that it does not state facts sufficient to constitute a cause of action, and, second, that several causes of action have been improperly united in this, that said complaint states a separate cause of action against each individual defendant, and nowhere states or attempts to state a cause of action against all of the defendants. This demurrer was sustained, and a decree rendered dismissing the bill at the costs of plaintiffs, and on appeal to the Supreme Court of the Territory that decree was affirmed.

The case is here on an appeal from that judgment. The complainants were M. B. Buford, J. W. Taylor, Charles Crocker and George Crocker, copartners under the firm name and style of the Promontory Stock Ranch Company. The defendants were John S. Houtz and Henry and Edward Conant, under the firm name and style of Houtz & Conant, the Box Elder Stock and Mercantile Company, a corporation, and twenty individuals whose names are given in the bill.

The plaintiffs allege that they are the owners of certain sections and parts of sections of land in the Territory of Utah, which they describe specifically by the numbers and the style of their Congressional subdivisions, very much of which is derived from the Central Pacific Railroad Company, to which they were granted by the Congress of the United States. These lands were alternate sections of odd numbers according to the Congressional grant to the railroad company, and they with the other tracts mentioned in the plaintiffs' bill are said

to amount to over 350,000 acres, "and extend over an area of forty miles in a northerly and a southerly direction, by about thirty-six miles in an easterly and westerly direction."

The allegation is, that these lands are very valuable for pasturage and the grazing of stock, and are of little or no value for any other purpose, and were held by the plaintiffs, and are now held by them, for that purpose solely. That owing to their character, the scarcity of water and the aridity of the climate where these lands are situated, they can never be subjected to any beneficial use other than the grazing of stock. That plaintiffs own and are possessed of large numbers of horned cattle, to wit, 20,000 head, of the value of $100,000, and are engaged in the sole business of stock raising. That for a long time they have had and now have all said cattle running and grazing upon these lands. That all the even numbered sections in each and all of the townships and fractional townships above mentioned belong to and are part of the public domain of the United States. That the defendants have not, nor has either of them, any right, title, interest or possession or right of possession, of or to any of the lands embraced in any of the townships or fractional townships above mentioned, nor have they ever had any such right, title, interest or possession. That none of the lands included within said townships or fractional townships are fenced or enclosed, except a small portion owned by plaintiffs, which they have heretofore enclosed with fences for use as corrals; within which to gather from time to time their cattle in order to brand the young thereof. They allege that for various reasons they cannot fence and enclose their lands without enclosing large portions of the lands of the United States, and without rendering large and valuable portions of their own of no value, by reason of the shutting off and preventing their own cattle from obtaining necessary water. That the defendants, Houtz and Conant, now and for a long time past, have owned a large number, to wit, 15,000 head of sheep, and each of the other defendants to this action is now and for a long time past has been the owner of a large flock or herd of sheep. The smallest number owned by any one party exceeds, as plaintiffs believe,

five thousand, and the aggregate number of, sheep so held exceeds two hundred thousand.

It is then alleged that the official survey of the United States has been extended over all land within the townships and fractional townships mentioned in the bill, and that there are seven well-defined and well-known travelled highways over those lands, four of which run in a northerly and southerly direction, and three in an easterly and westerly direction, entirely across the lands embraced in said townships and fractional townships, along which the sheep of the defendants may be driven without injury to plaintiffs' lands, notwithstanding which each of said defendants claims and asserts that he has the lawful right and is entitled to drive all sheep owned by him over and across any of said lands of these plaintiffs, and to pasture and graze his sheep thereon whenever and wherever he may desire so to do. That all of said defendants respectively rely upon and set up a common, though not a joint, pretended right to drive, graze and pasture his sheep thereon, and each of said defendants bases his pretended right to drive, graze and pasture his sheep upon the lands of the plaintiffs upon precisely the same state of facts as that relied upon by each of the other defendants. That is to say, each of said defendants claims that all the even numbered sections in each of said townships and fractional townships being unoccupied public domain of the United States, he has an implied license from the government of the United States to drive, graze and pasture his sheep thereon, and that he cannot do this without having them run, graze and pasture upon the lands of the plaintiffs. Therefore each of said defendants claims and asserts that he is entitled to have his said sheep run, graze and pasture upon the lands of the plaintiffs as aforesaid; and that during the year past each of said defendants did repeatedly drive large bands and herds of sheep over, upon and across the lands of these plaintiffs, and graze and pasture the same thereon, to the great injury and damage of the said plaintiffs, and that they and each of them threaten to continue to do this and will do it unless restrained by order of the court.

It is then alleged that the sheep, in grazing upon the lands,

do it a permanent injury, and drive away the cattle from such lands, whereby, if the defendants are permitted to drive and pasture their sheep on the lands of the plaintiffs, those lands will be greatly damaged, and, for a long period of time in the future, rendered valueless for the purpose of grazing and pasturing their cattle. They then allege that they have no adequate way of estimating the damage which they will suffer should defendants, or either of them, do as they have threatened to do as herein stated, for the reason, among others, that the destruction of the food grasses and herbage on plaintiffs' lands will result in depriving plaintiffs' cattle of necessary food, thereby causing great deterioration in flesh and consequent value, which loss and deterioration cannot be adequately determined by witnesses; which will result in the destruction of plaintiffs' business, will waste and impair their freehold, and obstruct them and each of them in the use of their said property. They allege, therefore, that they have no plain, adequate and speedy remedy at law; and that it will be impossible to establish the amount of damages which said plaintiffs will suffer by the wrong or trespass of any particular one of said defendants.

The prayer of the plaintiffs is for a judgment and decree of the court:

1st. That said defendants have not, nor has either of them, any right of way for any of his or their sheep over said lands of plaintiffs or any part thereof, except over and along the highways aforesaid; that they have not, nor has either of them, any right to graze or pasture any of his or their sheep thereon or on any part thereof.

2nd. That, pending this action, said defendants and each of them, their and each of their agents, servants and employés, be enjoined from driving any of his or their sheep upon any of said lands, except over and along said highways, or permitting any of them to go, graze or pasture thereon, and that upon the final decree herein said injunction be made perpetual.

3rd. For such other and further relief as may be just and equitable, together with their costs in this behalf incurred.

The Supreme Court of the Territory, in affirming the judg-

ment of the court of the Third Judicial District, did not consider the question of the misjoinder of defendants, but rested its judgment upon the want of equity in the bill. It might be difficult to sustain a bill which, like this, united fifteen or twenty different defendants, to restrain them from committing a trespass where, if the parties are guilty or should attempt to commit the trespass, they do it without concert of action, at different times, in different parts of a large district of country such as here described, and each in his own way and by his own action, or that of his servants. But, waiving this question, we are of opinion that the bill has no equity in it.

The appellants being stock-raisers, like the defendants, whose stock are raised and fattened on the unoccupied public lands of the United States mainly, seek by the purchase and ownership of parts of these lands, detached through a large body of the public domain, to exclude the defendants from the use of this public domain as a grazing ground, while they themselves appropriate all of it to their own exclusive use. This they propose to do, not by any act of Congress or of any legislative body whatever, but by means of this bill in chancery, obtaining an injunction against the defendants, whom they allege to be the owners of 200,000 sheep grazing upon these public lands, which shall exclude defendants from the use of them, and thereby secure to themselves the exclusive right to pasture their 20,000 head of cattle upon the same lands.

. If we look at the condition of the ownership of these lands, on which the plaintiffs rely for relief, we are still more impressed with the injustice of this attempt. A calculation of the area from which it is proposed to exclude the defendants by this injunction under the allegation that it is forty miles in one direction and thirty-six in another, shows that it embraces 1440 square miles, or 921,000 acres, all of which, as averred by the bill, is unenclosed and unoccupied except for grazing purposes. Of this 921,000 acres of land the plaintiffs only assert title to 350,000 acres; that is to say, being the owners of one-third of this entire body of land, which ownership attaches to different sections and quarter-sections scattered through the whole body of it, they propose by excluding the

defendants to obtain a monopoly of the whole tract, while two-thirds of it is public land belonging to the United States, in which the right of all parties to use it for grazing purposes, if any such right exists, is equal. The equity of this proceeding is something which we are not able to perceive.

It seems to be founded upon the proposition that while they, as the owners of the 350,000 acres thus scattered through the whole area, are to be permitted for that reason to exercise the right of grazing their own cattle upon all of the land embraced within these 1440 square miles, the defendants cannot be permitted to use even the lands belonging to the United States, because in doing this their cattle will trespass upon the unenclosed lands of plaintiffs. In other words, they seek to introduce into the vast regions of the public domain, which have been open to the use of the herds of stock-raisers for nearly a century without objection, the principle of law derived from England and applicable to highly cultivated regions of country, that every man must restrain his stock within his own grounds, and if he does not do so, and they get upon the unenclosed grounds of his neighbor, it is a trespass for which their owner is responsible.

We are of opinion that there is an implied license, growing out of the custom of nearly a hundred years, that the public lands of the United States, especially those in which the native grasses are adapted to the growth and fattening of domestic animals, shall be free to the people who seek to use them where they are left open and unenclosed, and no act of government forbids this use. For many years past a very large proportion of the beef which has been used by the people of the United States is the meat of cattle thus raised upon the public lands without charge, without let or hindrance or obstruction. The government of the United States, in all its branches, has known of this use, has never forbidden it, nor taken any steps to arrest it. No doubt it may be safely stated that this has been done with the consent of all branches of the government, and, as we shall attempt to show, with its direct encouragement.

The whole system of the control of the public lands of the

United States as it had been conducted by the government, under acts of Congress, shows a liberality in regard to their use which has been uniform and remarkable. They have always been open to sale at very cheap prices. Laws have been enacted authorizing persons to settle upon them, and to cultivate them, before they acquire any title to them. While in the incipiency of the settlement of these lands, by persons entering upon them, the permission to do so was a tacit one, the exercise of this permission became so important that Congress, by a system of laws, called the preëmption laws, recognized this right so far as to confer a priority of the right of purchase on the persons who settled upon and cultivated any part of this public domain. During the time that the settler was perfecting his title, by making the improvements which that statute required and paying, by instalments or otherwise, the money necessary to purchase it, both he and all other persons who desired to do so had full liberty to graze their stock upon the grasses of the prairies and upon other nutritious substances found upon the soil.

The value of this privilege grew as the population increased, and it became a custom for persons to make a business or pursuit of gathering herds of cattle or sheep, and raising them and fattening them for market upon these unenclosed lands of the government of the United States. Of course the instances became numerous in which persons purchasing land from the United States put only a small part of it in cultivation, and permitted the balance to remain unenclosed and in no way separated from the lands owned by the United States. All the neighbors who had settled near one of these prairies or on it, and all the people who had cattle that they wished to graze upon the public lands, permitted them to run at large over the whole region, fattening upon the public lands of the United States, and upon the unenclosed lands of the private individual, without let or hindrance. The owner of a piece of land, who had built a house or enclosed twenty or forty acres of it, had the benefit of this universal custom, as well as the party who owned no land. Everybody used the open unenclosed country, which produced nutritious grasses, as a public common on

which their horses, cattle, hogs and sheep could run and graze.

It has never been understood that in those regions and in this country, in the progress of its settlement, the principle prevailed that a man was bound to keep his cattle confined within his own grounds, or else would be liable for their trespasses upon the unenclosed grounds of his neighbors. Such a principle was ill-adapted to the nature and condition of the country at that time. Owing to the scarcity of means for enclosing lands, and the great value of the use of the public domain for pasturage, it was never adopted or recognized as the law of the country, except as it might refer to animals known to be dangerous, and permitted to go where their dangerous character might produce evil results. Indeed, it is only within a few years past, as the country has been settled and become highly cultivated, all the land nearly being so used by its owners or by their tenants, that the question of compelling the owner of cattle to keep them confined has been the subject of agitation.

Nearly all the States in early days had what was called the fence law, a law by which a kind of fence, sufficient in a general way to protect the cultivated ground from cattle and other domestic animals which were permitted to run at large, was prescribed. The character of this fence in most of the statutes was laid down with great particularity, and unless it was in strict conformity to the statute there was no liability on the part of the owner of cattle if they invaded the enclosure of a party and inflicted injury on him. If the owner of the enclosed ground had his fence constructed in accordance with the requirements of the statute, the law presumed then that an animal which invaded this enclosure was what was called a *breachy* animal, was not such animal as should be permitted to go at large, and the owner was liable for the damages done by him. Otherwise the right of the owner of all domestic animals, to permit them to run at large, without responsibility for their getting upon the lands of his neighbor, was conceded.

The Territory of Utah has now, and has always had, a similar statute, section 2234 of the compiled laws of Utah,

1888, Vol. I. p. 789. It is now a matter of occasional legislation in the States which have been created out of this public domain, to permit certain counties, or parts of the State, or the whole of the State, by a vote of the people within such subdivisions, to determine whether cattle shall longer be permitted to run at large and the owners of the soil compelled to rely upon their fences for protection, or whether the cattle-owner shall keep them confined, and in that manner protect his neighbor without the necessity on the part of the latter of relying upon fences which he may make for such protection.

Whatever policy may be the result of this current agitation can have no effect upon the present case, as the law of Utah and its customs in this regard remain such as we have described it to be in the general region of the Northwest; and the privileges accorded by the United States for grazing upon her public lands are subject alone to their control.

These principles were very clearly enunciated by the Supreme Court of Ohio in 1854 in the case of *Kerwhacker* v. *The C. C. & C. Railroad Company*, 3 Ohio St. 172, 178–9. In discussing this question, the court expresses so well the principle which we are considering that we venture to make an extensive quotation from the opinion.

"Admitting the rule of the common law of England in relation to cattle and other live stock running at large to be such as stated, the question arises whether it is applicable to the condition and circumstances of the people of this State, and in accordance with their habits, understandings and necessities. If this be the law in Ohio now it has been so since the first settlement of the State, and every person who has allowed his stock to run at large and go upon the uninclosed grounds of others has been a wrong-doer, and liable to an action for damages by every person on whose lands his creatures may have wandered. What has been the actual situation of affairs, and the habits, understandings and necessities of the people of this State from its first settlement up to the present period in this respect? Cattle, hogs and other kinds of live stock not known to be breachy and unruly, or dangerous, have been allowed at all times and in all parts of the State to run at

large and graze on the range of uncultivated and uninclosed lands. . . . So that it has been the general custom of the people of this State, since its first settlement, to allow their cattle, hogs, horses, etc., to run at large, and range upon the uninclosed lands of the neighborhood in which they are kept; and it has never been understood by them that they were tort-feasors, and liable in damages for letting their stock thus run at large. The existence or enforcement of such a law would have greatly retarded the settlement of the country, and have been against the policy of both the general and the state governments.

"The common understanding upon which the people of this State have acted since its first settlement has been that the owner of land was obliged to inclose it with a view to its cultivation; that without a lawful fence he could not, as a general thing, maintain an action for a trespass thereon by the cattle of his neighbor running at large; and that to leave uncultivated lands uninclosed was an implied license to cattle and other stock at large to traverse and graze them. Not only, therefore, was this alleged rule of the common law inapplicable to the circumstances and condition of the people of this State, but inconsistent with the habits, the interests, necessities and understanding of the people."

In the case of *Seeley* v. *Peters*, 10 Illinois (5 Gilman), 130, 142, in the Supreme Court of Illinois in 1848, six years earlier than the Ohio case, the court in reference to the same subject by Judge Trumbull uses the following language:

"Perhaps there is no principle of the common law so inapplicable to the condition of our country and people as the one which is sought to be enforced now for the first time since the settlement of the State. It has been the custom in Illinois, so long that the memory of man runneth not to the contrary, for the owners of stock to suffer them to run at large. Settlers have located themselves contiguous to prairies for the very purpose of getting the benefit of the range. The right of all to pasture their cattle upon uninclosed ground is universally conceded. No man has questioned this right, although hundreds of cases must have occurred where the owners of cattle

have escaped the payment of damages on account of the insufficiency of the fences through which their stock have broken, and never till now has the common law rule, that the owner of cattle is bound to fence them up, been supposed to prevail or to be applicable to our condition. The universal understanding of all classes of the community, upon which they have acted by inclosing their crops and letting their cattle run at large, is entitled to no little consideration in determining what the law is, and we should feel inclined to hold, independent of any statutes upon the subject, on account of the inapplicability of the common law rule to the condition and circumstances of our people, that it does not and never has prevailed in Illinois. But it is unnecessary to assume that ground in this case. The legislature [legislation] upon this subject, from the time when we were a part of the Indiana Territory down to the last law contained in the Revised Statutes, clearly shows that the legislature never supposed that this rule of the common law prevailed in Illinois, or intended that it should."

The same principle is asserted in the case of *Comerford* v. *Dupuy*, 17 California, 308, 310; and in the case of *Logan* v. *Gedney*, 38 California, 579, the court distinctly held that "the rule of the law of England, that every man is bound to keep his beasts in his own close under the penalty of answering in damages for all injuries resulting from their being permitted to range at large, never was the law in California." This decision is the more in point, as California, like Utah, was acquired from Mexico by the same treaty. See also *Studwell* v. *Ritch*, 14 Connecticut, 292.

As evidence of the liberality with which the government of the United States has treated the entire region of country acquired from Mexico by the treaty of Guadalupe Hidalgo, it is only necessary to refer to the fact that while by the laws of Mexico every discoverer of a mine of the precious metals was compelled to pay a certain royalty to the government for the use of the mine in extracting its minerals, as soon as the country came under the control of the United States, an unlimited right of mining by every person who chose to enter

upon and take the risks of the business was permitted without objection and without compensation to the government ; and while this remained for many years as a right resting upon the tacit assent of the government, the principle has been since incorporated into the positive legislation of Congress, and to-day the larger part of the valuable mines of the United States are held by individuals under the claim of discovery, without patent or any other instrument from the government of the United States granting this right, and without tax or compensation paid to the government for the use of the precious metals.

. As showing this extreme liberality on the part of the general government, reference may be had to the case of *Forbes* v. *Gracey*, 94 U. S. 762. In that case a mining company which had no title whatever from the United States, and which was taking out mineral ore of immense value from the lands of the United States, sought to enjoin the State of Nevada from taxing the ore thus taken, on the ground that it was the property of the United States, and not taxable by the State of Nevada. But this court, reverting to the liberality of the government in that regard, decided that the moment the ore became detached from the main vein in which it was embedded in the mine, it became the property of the miner, the United States having no interest in it, and was therefore subject to state taxation.

Upon the whole, we see no equity in the relief sought by the appellants in this case, which undertakes to deprive the defendants of this recognized right to permit their cattle to run at large over the lands of the United States and feed upon the grasses found in them, while, under pretence of owning a small proportion of the land which is the subject of controversy, they themselves obtain the monopoly of this valuable privilege.

The decree of the Supreme Court of Utah is therefore

*Affirmed.*