## NORTHERN PAC. RY. CO. v. CUNNINGHAM.

(Circuit Court, D. Washington, S. D.    October 14, 1898.)

ANIMALS—INJUNCTION TO PREVENT TRESPASS—RIGHT OF PASTURAGE.

In the state of Washington, where, by statute, the pasturing of sheep on the lands of another without his consent, whether inclosed or uninclosed, is made unlawful, it is not a defense to a suit to enjoin such pasturage to allege that complainant's lands comprise every alternate section, that they are uninclosed, and that it is necessary for defendant's sheep to pass over them in order to reach the intervening uninclosed sections, which are owned by the government, and on which defendant, in common with all citizens, had a license of pasturage; as the right of way to pass over lands does not give the right of pasturage. The matter so pleaded, however, is proper to be considered as a partial defense, and in determining the limits and conditions of any injunction to which complainant may be entitled.

This is a suit in equity to enjoin defendant from pasturing sheep on uninclosed lands of complainant.    Heard on exceptions to answer.

Crowley & Grosscup, for complainant.

A. S. Bennett, for defendant.

HANFORD, District Judge.    This is a suit for an injunction to restrain the defendant from pasturing sheep upon uninclosed lands owned by the plaintiff, situated in Yakima county, in the state of Washington, said lands being part of the land grant to the Northern Pacific Railroad Company.    The answer sets up that the lands referred to in the plaintiff's bill of complaint are alternate odd-numbered sections, and that the same are uninclosed, and the boundaries thereof unmarked, the original survey stakes set at the section corners having been destroyed; that the alternate even sections are public lands of the United States, upon which the plaintiff claims the right, as a licensee of the government, in common with all other citizens, to pasture sheep; that it is impossible for the defendant, or others having the right, to use the vacant uninclosed grazing lands belonging to the United States in the vicinity described in the complaint without crossing over the alternate odd-numbered sections to which the plaintiff claims title; that the defendant is innocent of any intention to trespass upon the plaintiff's lands; and that his sheep do graze upon the plaintiff's lands only to a limited extent, which the defendant is unable to prevent, because of the failure of the plaintiff to inclose its lands, or to mark the boundary line separating the odd-numbered from the alternate even-numbered sections.    The plaintiff has filed exceptions on the ground that the matters so pleaded in the answer do not constitute a defense.

In the argument, counsel for the defendant has presented with earnestness and ability the following propositions:

"(1) That in all such grants or conveyances—that is, where the land granted is entirely surrounded by the land reserved to the grantor, and vice

versa—that there is a way of necessity which passes to the grantee, on the one hand, and is reserved by the grantor, on the other, to pass across the land granted or reserved, as the case may be, to reach its own land.

"(2) That this right goes with the land, and passes to any person using the land, with the consent of the owner, whether it be a tenant or a licensee, going there with the permission of the owner.

"(3) That the defendant in this case, in common with all citizens of the country, is a licensee of the government in the use of its public lands for grazing purposes, and goes there to use the land with its permission and authority, and therefore, as long as such implied permission and authority continue, has the same right to go across plaintiff's land to reach the government sections, as against the plaintiff, as the government itself would have."

I can, and do, give the defendant the full benefit of the above propositions in their entirety; but, having done this, I am still far away from the conclusion which the defendant's counsel has endeavored to draw from these propositions. A way of necessity can be claimed only on the ground of necessity. The right is limited to the single purpose of affording access to premises which would otherwise be inaccessible, and under this pretense there can be no legal or equitable claim to an easement in all of the lands surrounding the premises to which the right of access may be claimed, nor to any greater area than is reasonably sufficient for the purpose of a highway. In face of the facts pleaded in this answer, the plaintiff would have no case if the object of the suit was to restrain the defendant from driving sheep across its lands for the purpose of pasturing the same upon the alternate sections owned by the government. But the purpose of this suit is different. The plaintiff complains because the defendant's sheep consume the entire crop of grass upon its lands, and are doing permanent injury to the land itself, by destroying the roots of the grasses, and poisoning the lands; and it is no answer to this complaint for the defendant to say that he claims an easement and a right to use sufficient of the plaintiff's lands as a highway to gain access to other lands where he may lawfully take his sheep for pasturing.

The case of Buford v. Houtz, 133 U. S. 320–332, 10 Sup. Ct. 307, upon which the defendant relies, would be conclusive in his favor upon this hearing, if the local law upon which that decision rests prevailed in this state. In the opinion by Mr. Justice Miller, the supreme court is careful to make it clear that in Utah, where the case arose, the rule of the common law, that the owner of domestic animals should be liable for their trespassing upon uninclosed land of his neighbor, does not prevail, but, on the contrary, his right to permit them, when not dangerous, to run at large, without responsibility for their getting upon such land of his neighbor, is a part of the statute law. The opinion is instructive, and as I must, before the final determination of the rights of the parties, give prominence to the important difference in the local law affecting them from the law of Utah, which controlled that decision, I deem it proper to insert here a quotation of sufficient length to show clearly the considerations upon which the decision rests:

"We are of opinion that there is an implied license, growing out of the custom of nearly a hundred years, that the public lands of the United

States, especially those in which the native grasses are adapted to the growth and fattening of domestic animals, shall be free to the people who seek to use them where they are left open and uninclosed, and no act of the government forbids this use. For many years past, a very large proportion of the beef which has been used by the people of the United States is the meat of cattle thus raised upon the public lands, without charge, without let or hindrance or obstruction. The government of the United States, in all its branches, has known of this use, has never forbidden it, nor taken any steps to arrest it. No doubt, it may be safely stated that this has been done with the consent of all branches of the government, and, as we shall attempt to show, with its direct encouragement. The whole system of the control of the public lands of the United States as it has been conducted by the government, under acts of congress, shows a liberality in regard to their use which has been uniform and remarkable. They have always been open to sale at very cheap prices. Laws have been enacted authorizing persons to settle upon them, and to cultivate them, before they acquire any title to them. While in the incipience of the settlement of these lands, by persons entering upon them, the permission to do so was a tacit one, the exercise of this permission became so important that congress, by a system of laws, called the 'Pre-emption Laws,' recognized this right so far as to confer a priority of the right of purchase on the persons who settled upon and cultivated any part of this public domain. During the time that the settler was perfecting his title, by making the improvements which that statute required, and paying, by installments or otherwise, the money necessary to purchase it, both he and all other persons who desired to do so had full liberty to graze their stock upon the grasses of the prairies, and upon other nutritious substances found upon the soil. The value of this privilege grew as the population increased, and it became a custom for persons to make a business or pursuit of gathering herds of cattle or sheep, and raising them, and fattening them for market, upon these uninclosed lands of the government of the United States. Of course, the instances became numerous in which persons purchasing land from the United States put only a small part of it in cultivation, and permitted the balance to remain uninclosed and in no way separated from the lands owned by the United States. All the neighbors who had settled near one of these prairies, or on it, and all the people who had cattle that they wished to graze upon the public lands, permitted them to run at large over the whole region, fattening upon the public lands of the United States, and upon the uninclosed lands of the private individual, without let or hindrance. The owner of a piece of land, who had built a house or inclosed twenty or forty acres of it, had the benefit of this universal custom, as well as the party who owned no land. Everybody used the open, uninclosed country, which produced nutritious grasses, as a public common, on which their horses, cattle, hogs, and sheep could run and graze. It has never been understood that in those regions and in this country, in the progress of its settlement, the principle prevailed that a man was bound to keep his cattle confined within his own grounds, or else would be liable for their trespasses upon the uninclosed grounds of his neighbors. Such a principle was ill adapted to the nature and condition of the country at that time. Owing to the scarcity of means for inclosing lands, and the great value of the use of the public domain for pasturage, it was never adopted or recognized as the law of the country, except as it might refer to animals known to be dangerous, and permitted to go where their dangerous character might produce evil results. Indeed, it is only within a few years past, as the country has been settled and become highly cultivated, all the land nearly being so used by its owners or by their tenants, that the question of compelling the owner of cattle to keep them confined has been the subject of agitation. Nearly all the states in early days had what was called the 'Fence Law,'— a law by which a kind of fence, sufficient in a general way to protect the cultivated ground from cattle and other domestic animals which were permitted to run at large, was prescribed. The character of this fence in most of the statutes was laid down with great particularity; and, unless it was in strict conformity to the statute, there was no liability on the part

of the owner of cattle if they invaded the inclosure of a party, and inflicted injury on him. If the owner of the inclosed ground had his fence constructed in accordance with the requirements of the statute, the law presumed then that an animal which invaded this inclosure was what was called a 'breachy' animal, was not such animal as should be permitted to go at large, and the owner was liable for the damages done by him; otherwise, the right of the owner of all domestic animals to permit them to run at large, without responsibility for their getting upon the lands of his neighbor, was conceded. The territory of Utah has now, and has always had, a similar statute,—section 2234, vol. 1, p. 789, Comp. Laws Utah 1888. It is now a matter of occasional legislation in the states which have been created out of this public domain to permit certain counties, or parts of the state, or the whole of the state, by a vote of the people within such subdivisions, to determine whether cattle shall longer be permitted to run at large, and the owners of the soil compelled to rely upon their fences for protection, or whether the cattle owner shall keep them confined, and in that manner protect his neighbor without the necessity on the part of the latter of relying upon fences which he may make for such protection. Whatever policy may be the result of this current agitation can have no effect upon the present case, as the law of Utah and its customs in this regard remain such as we have described it to be in the general region of the Northwest; and the privileges accorded by the United States for grazing upon her public lands are subject alone to their control."

In this state the rule is the same as in Utah, except as to sheep. Whether founded in truth or not, the belief is prevalent in this state that, wherever flocks of sheep are herded, the land is injured for grazing purposes, and the interests of cattlemen and other farmers have prevailed with the legislature; so that more than 10 years ago the pasturing of sheep upon lands owned by any person other than the owner of the sheep, whether inclosed or uninclosed, without the consent of the owner of such lands, was made unlawful. Ballinger's Code Wash. § 3482 (1 Hill's Code, § 2510). The owner of the land whose title is not disputed has a right in equity to preventive relief against any person who, without right, is causing irreparable injury by extracting minerals from the land, or cutting timber thereon; and for the same reason he should have relief against a trespasser who impairs the value of grazing lands by destroying the roots of the grass, or in any way makes the same unfit for grazing purposes.

It is my opinion that in this state the pasturing of sheep upon uninclosed grazing land, without the owner's consent, is unlawful, and especially injurious to the owner, because it depreciates the value of the land; and that, in a suit for an injunction to prevent such injury, the matters pleaded in the answer do not constitute a complete defense, but are proper to be considered in fixing the limits and conditions of a decree granting an injunction, and also proper to be considered if there should be occasion to enforce an injunction or punish disobedience by contempt proceedings. For this reason the exceptions will be overruled, but the parties will understand that, upon the final hearing, proper relief to the complainant will not be denied for any of the reasons set forth in the answer.