Whaley, Chief Justice,
delivered the opinion of the court:
This case is one of several brought by the Sioux Nation and involves a large tract of land in the Northwest. It is agreed that it should be tried under Rule 39A which limits the hearing to the issues of fact and law relating to the right of the plaintiff to recover. The question of the extent of the recovery and the amount of set-offs are reserved for future proceedings.
In 1868 a treaty was made with the Sioux Nation which was ratified by the Senate in 1869,15 Stat. 685, 636, whereby a certain definite tract of country was set apart for the absolute and undisturbed use and occupation of these Indians. The tract of country, so set apart, was described in Article II of the treaty, as follows:
Article II. The United States agrees that the following district of country, to wit, viz: commencing on the east bank of the Missouri River where the forty-sixth paral-lei of north latitude crosses the same, thence along low-water mark down said east bank to a point opposite where the northern line of the State of Nebraska strikes the river, thence west across said river, and along the northern line of Nebraska to the one hundred and fourth degree of longitude west from Greenwich, thence north on said meridian to a point where the forty-sixth parallel of north latitude intercepts the same, thence due east along said parallel to the place of beginning; and in *166 addition thereto, all existing reservations on the east bank of said river shall be, and the same is, set apart for the absolute and undisturbed use and occupation of the Indians herein named, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them; and the United States now solemnly agrees that no persons except those herein designated and authorized so to do, and except such officers, agents, and employes of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article, or in such territory as may be added to this reservation for the use of said Indians, and henceforth they will and do hereby relinquish all claims or right in and to any portion of the United States or Territories, except such as is embraced within the limits aforesaid, and except as hereinafter provided.
This treaty gave the Sioux Nation a permanent reservation to the lands described thereunder. The Indian Nation possessed the use and occupancy of this reservation and, as has been repeatedly held, this was equivalent to an Indian title and therefor was in the nature of a cession by the United States of this territory to the Indian Nation. It is unquestioned that the United States retained the fee simple in all Indian lands. Johnson v. McIntosh, 8 Wheat. 543; Beecher v. Wertherby, 95 U. S. 517.
After this permanent reservation had been made to the Sioux Nation, with the exception of two small reservations on the east bank of the Missouri River, the whole territory on the east bank became public property subject to settlement and sale.
In 1874 the Commissioner of Indian Affairs reported to the Secretary of the Interior that the liquor traffic on the Missouri River was being taken advantage of by white men because of the ready access to the great Sioux Reservation and it was necessary to take steps to suppress it. He recommended to the Secretary of the Interior that the President be requested to issue an order withdrawing from sale and setting apart for Indian purposes a certain tract of land adjoining this Indian Reservation on the east so as to sup *167 press tbe liquor traffic with the Indians upon the Missouri ■River. The Secretary of the Interior, agreeing with the Commissioner of Indian Affairs, recommended to the President the withdrawing of this land on the east of the permanent reservation from settlement and sale so as to protect the Indians against this injurious traffic. On January 11, 1875, the President signed an Executive Order withdrawing from settlement and sale certain lands on the east bank of the Missouri River described in the order. The order stated in part, after a description of the portion withdrawn:
* * * the same hereby is, withdrawn from sale and set apart for the use of the several tribes of Sioux Indians as an addition to their present reservation in said Territory.
On February 15, 1875, certain residents of the lands embraced in the above Executive Order complained about molestations by the Indians on the settlers on the lands covered by ■the Executive Order. As a result, on March 13,1875, the Commissioner of Indian Affairs recommended to the Secretary of the Interior a further withdrawal from settlement and sale of certain lands, which had not been included in the previous withdrawal order, so as to suppress the liquor traffic with :the Indians at the Standing Rock Agency. As a result of this Tecommendation of the Secretary of the Interior, the President signed on March 16,1875, a withdrawal order describing "by metes and bounds certain lands to be set apart for the use ■of the several tribes of the Sioux Indians as an addition to their present reservation and territory.
Following this addition to the territory set aside for the reservation of the Sioux Indians, two other tracts of land were added to the reservation of the Sioux Indians by Executive 'Orders of May 20,1875, and November 28,1876, both of these Executive Orders being based on the suggestion of the Commissioner of Indian Affairs and the recommendation of the Secretary of the Interior to suppress the liquor traffic with the Indians on the treaty reservation.
In these four Executive Orders there is the expression “use” ■of the several tribes and not the words “use and occupation” ■or “use or occupation” as expressed in the treaty. It is true that the words “as an addition to their present reservation in .said Territory” are used.
*168 These four Executive Orders took from settlement and sale 5,161,130.48 acres under Executive Order of January 11,1875; 784,898.82 acres under Executive Order of March 16, 1875; 111,648.31 acres under Executive Order of May 20,1875; and 120,247.02 acres under Executive Order of November 28,1876, respectively, or a total of 6,167,919.13 acres.
In 1879, the Secretary of the Interior, who had been advised by the Commissioner of Indian Affairs, recommended that the lands, with certain exceptions, so withdrawn from settlement and sale under the four orders above mentioned, could be restored to the public domain and the liquor traffic with the Indians suppressed, under the act of February 27, 1879 (19 Stat. 244). As a result of this recommendation of the Secretary of the Interior on August 9, 1879, the President signed an order restoring a part of these lands to the public domain. The lands embraced in this order contained approximately 5,562,035.45 acres.
Upon the recommendation of the Secretary of the Interior an Executive Order was signed on March 20, 1884, restoring-lands embraced within the four Executive Orders of 1875 and 1876 not included in the previous order of restoration of 1879,, the lands consisting of one tract opposite the Standing Eock Agency, a tract opposite the mouth of the Grand Eiver and a tract opposite the mouth of the Big Cheyenne Eiver Agency. The tracts so restored to the public domain measured approximately 104,981.29 acres.
On June 3, 1920, Congress passed a special jurisdictional act (41 Stat. 738) giving the Sioux Tribe of Indians the right, to sue in this court on all claims arising under any treaties,, agreements, or laws of Congress, or for the misappropriation of any funds or lands of said tribe and the court the right to hear and determine all legal and equitable claims of the said', tribe against the United States.
It is contended by the plaintiff that the four Executive-Orders of 1875 and 1876, in which these large tracts of lands-were added to the Sioux permanent reservation gave to the Sioux Nation the same title to these additional tracts as they had in the permanent reservation which was made by the treaty with the Sioux Nation. In other words, that the ex *169 pression in tlie Executive Orders “use” of said tribe was equivalent to “use and occupation” or “use or occupation” and constituted an Indian title to the lands and that, when the lands were taken away by the orders of 1879 and 1884, there was such a fee in the Indians, as has been recognized by the Congress and the courts, as constituted an Indian title for which compensation should be given.
We do not think it is necessary or useful for a decision in this case to recite the many acts of the Executive dealing with the public lands and withdrawing them from settlement and sale and setting apart certain portions as a reservation for the wandering bands of Indians. A full history of these Executive Orders is set out in the case of the United States v. Midwest Oil Company, 236 U. S. 459.
The title to the land involved in this case was originally in the United States, and the sole question before us is whether an irrevocable conveyance was made to the Indians which divested the Government of its interest in whole or in part. It is unnecessary to go into a discussion of the question of Indian country and Indian title because it has been well settled that Indian country means not only the lands reserved for the Indian reservations but lands over which the Indians roved. Indian title simply means that where the land has been reserved by treaty, act of Congress, or Executive Order, subsequently ratified by the Congress, the Indians take such a title to the land that when the land is taken away from them they are entitled to compensation. The actual fee is always in the United States but the use of the terms' “use and occupation”, “use or occupation”, or “occupation” carry such an equitable title in the Indians that the Congress of the United States has always recognized that compensation should be given the Indians for the lands when they are taken. Spalding v. Chandler, 160 U. S. 394; Seneca Nation v. Christy, 162 U. S. 283, 288, 289.
It has always required Congressional action for the payment to the Indians for lands so taken, either by direct action of Congress or by submission of the claim to the courts for adjudication. Frost v. Wenie, 157 U. S. 46, 50; Minnesota v. Hitchcock, 185 U. S. 373, 388; Lone Wolf v. Hitchcock, 187 *170 U. S. 553; United States v. Blendaur, 128 Fed. 910, 913; Ash Sheep Co. v. United States, 252 U. S. 159.
There are three kinds of Indian reservations: those which were created by treaties previous to 1871; those which have been created by acts of Congress since 1871; and those made by Executive Orders whereby the President has set apart public lands for the use of the Indians in order to keep them within a certain territory. By the act of June 30, 1919, the President was expressly prohibited from issuing Executive Orders creating reservations out of the public lands. (41 Stat. 3,34.) ■
In reference to Executive Order reservations, there was no law under which the President acted, but it has been recognized that the President issued these Executive Orders setting aside these public lands for public use under the right of the Executive to carry out the policy of preserving the public interest. The fee of any interest in these lands was never in the Executive.
The Constitution of the United States under Article 4, Sec. 3, provides that “The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States. * * *”
This power to dispose of lands belonging to the United States is broadly conferred upon the Congress and it is only by legislation that the lands of the United States can be disposed of. In order to dispose of the public lands it is necessary for the Congress to take some action either by direct legislation or by conferring upon the President the power of the Congress so that he, acting as the agent of the Congress, can dispose of the lands. Van Brocklin v. Tennessee, 117 U. S. 151, 168; Wisconsin Railroad Co. v. Price County, 133 U. S. 496, 504.
In the Wisconsin Railroad Company case, supra, the court said:
* * * The Constitution vests in Congress the power to “dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States.” And this implies an exclusion of all other authority over the property which could interfere with this right or obstruct its exercise. Van Brocklin v. State of Tennessee, 117 U. S. 151, 168.
*171 In the case of Gibson v. Choteau, 13 Wall. 92, 99, the court said:
With respect to the public domain, the Constitution vests in Congress the power of disposition and of making all needful rules and regulations. That power is subject to no limitations. Congress has the absolute right to prescribe the times, the conditions, and the mode of transferring this property, or any part of it, and to designate the persons to whom the transfer shall be made.
In the case of United States v. Midwest Oil Company, supra, it was held that the President had the right to withdraw public lands from settlement and sale, due to the fact that Congress had acquiesced in and given implied sanction of such a course of action from an early period in the history of the country and has never repudiated the exercise of such power. However, the court did not intend to mean that the power of withdrawal from settlement and sale gave to the President the right of alienation of the public property. It was for the protection of the public interest that these withdrawal orders were made and not for the purpose of disposing of the public lands. The President had no right to dispose of public lands under the Constitution. In that case the court further held at page 474:
For it must be borne in mind that Congress not only has a legislative power over the public domain, but it also exercises the powers of the proprietor therein. Congress “may deal with such lands precisely as a private individual may deal with his farming property. It may sell or withhold them from sale.” Camfield v. United States, 167 U. S. 524; Light v. United States, 220 U. S. 536. Like any other owner it may provide when, how, and to whom its land can be sold. It can permit it to be withdrawn from sale. Like any other owner, it can waive its strict rights, as it did when the valuable privilege of grazing cattle on this public land was held to be based upon an “implied license growing out of the custom of nearly a hundred years.” Buford v. Houtz, 133 U. S. 326. So too, in the early days the “Government, by its silent acquiescence, assented to the general occupation of the public lands for mining.” Atchison v. Peterson, 20 Wall. 512. If private persons could acquire a privilege in public land by virtue of an implied congressional consent, then for a much stronger reason, an implied grant of jiower to preserve the public interest would arise out of like congressional acquiescence.
*172 It will be seen that in all these cases it was a question of withdrawal by the President of public lands from settlement and sale or the right to mineral and oil rights of public lands but in no instance can we find a statement of what interest, if any, was given to Indian Tribes in lands set apart by Executive Orders for their use where such Indian Tribes had a permanent treaty reservation. In some of the Executive Orders adding lands out of the public domain to Indian territory there was the express provision that they were for temporary use. (Executive Orders, October 10, 1910, and March 22,1911.)
In the case before us, although the Executive Orders did not contain words of a temporary nature, nevertheless, the recommendation of the Commissioner of Indian Affairs to the Secretary of the Interior, on which these Executive Orders were based, showed that the additions were solely for the purpose of regulating the liquor traffic on the Missouri River and the protection of these Indians on their permanent reservation from the injurious and harmful effects of such traffic. The use of the words in the treaty “or in such territory as may be added to this reservation for the use of said Indians” clearly intended such lands which may be added thereto, either by treaty, which was the sole way by which Congress dealt with these Indian Tribes up to 1871, or by act of Congress after 1871. Congress did not intend by these words to vest in the President the fee to the public domain, or the power to dispose of the title to it, a power which was, under the Constitution, in the Congress alone. It would have required some act of Congress by prior legislation, or subsequent ratification of the Executive Orders, in order to divest the United States of its title to .the land and place it elsewhere. The President was simply an agent of the Congress. Under Article II § 8, of the Constitution, authority of the President is defined as follows:
He (the President) shall take care that the laws be faithfully executed.
But this section does not give the President the right to dispose of the public lands which the Constitution has committed to Congress and shows the lack of authority in the President to convey any interests in public domain which *173 have not been authorized by the Congress by previous or subsequent legislation. It is the President’s duty to see that the laws are faithfully executed and in this discharge of his duties the public lands can be withdrawn when it is in the interest of the public.
There was never any previous authority given to the President, before these four Executive Orders were signed, to dispose of the interest of the Government in these lands nor has there been any subsequent ratification of the two withdrawal orders of 1879 and 1884 to the present date.
The Sioux Nation did not get by these four Executive Orders, adding land to their permanent reservation, any interest for which the Government is responsible either in law or in equity. The additions were of a temporary nature to
■ serve a public interest, and, when that public interest had been served, the withdrawal orders of 1879 and 1884 were issued returning the land to the public right of settlement and sale.
The plaintiff seems to rely chiefly on the opinion of Attorney General Stone rendered in 1924 to the President and the Secretary of the Interior. (34 Op. Atty. Gen. 181). The question before the Attorney General was whether the General Leasing Act of February 25, 1920, 41 Stat. 437, applied to Executive Order Indian reservations and he held that, where public lands had been set aside by Executive Order as ; an Indian reservation, the Leasing Act did not apply. It is true that in this opinion the question of Executive Order reservations was discussed but it was simply to show that in : treaty reservations, Congressional reservations, and Executive Order reservations, where the Indians were on the lands occupying and using them, these lands could not be leased for oil and mineral deposits. It must be borne in mind, that, when the President ordered the four additions to the Sioux reservation, the orders contained the word “use” and not “use and ■occupation” or “use or occupation.” It has been repeatedly held, and there is no need of citing authorities it is so well established, that when the words “use and occupation” or “use or occupation” are used in setting aside Indian reservations, although the fee remains in the Government nevertheless the Indians take such an equitable interest in the lands that when the lands are taken either by Congressional action or by with- ■ drawal by the President, compensation has been paid to the *174 Indians. This is not true, however, where these words have not been used and in many instances where there have been withdrawals of lands from Indian reservations, which have been made by Executive Order, no compensation has been paid.
Attorney General Stone in his opinion uses the following language:
When, by an executive order, public lands are set aside, either as a new Indian reservation or an addition to an old one without further language indicating that the action is a mere temporary expedient, such lands are thereafter properly known and designated as an “Indian reservationand so long, at least, as the order continues in force, the Indians have the right of occupancy and use and the United States has the title in, fee. Spalding v. Chandler, 160 U. S. 394; In re Wilson, 140 U. S. 575. [Italics ours.]
It will be seen that the Attorney General specifically states “so long, at least, as the order continues in force”.
In the instant case the Executive Orders of 1875 and 1876 were withdrawn in 1879 and 1884. For over sixty years the Sioux Indians have not had the use of these lands and even during the periods from 1875 to 1879 and 1884 they had only the use which permitted hunting of buffalo and other game.
The opinion of the Attorney General must not be taken too broadly. The opinion was dealing with the General Leasing Law and its application to public lands and was rendered before the act of May 29, 1924 (43 Stat. 244} was passed. That act provided that unallotted lands on Indian Reservations, other than the Five Civilized Tribes and the Osage Reservation, were subject to leasing for mining purposes with the consent of the Council for the Indians, and the money received from the leasing of these lands belonged to the Indians but the State should have the right to tax the lands in which the leases were situate and the Secretary of the Interior was to pay the tax so assessed. It will be seen that this law provided for the unallotted lands on the Indian reservations. This clearly indicated permanent reservations made by treaty or act of Congress and not temporary reservations or additions to reservations made by the President under Executive Orders. This shows the intent of Congress to recognize one class and not to recognize the other.
*175 In Lone Wolf v. Hitchcock, supra, the Supreme Court held that the plenary power of Congress over tribal Indian property is such that the provisions in the existing treaty with the Indians could be abrogated without their consent. It was largely a question of policy for Congress to determine what interest the Indians would have in the lands.
This court has nothing to do with the moral question; that is a matter of policy and grace for the Congress. We must take into consideration all the relevant facts and circumstances surrounding the creation of the additions to the reservation in determining the character and extent of the Indian interests.
Taking all these matters into consideration, it seems clear that in issuing the Executive Orders of 1875 and 1876, which added some six million and odd acres to the Sioux treaty reservation, it was intended as a temporary expedient in order to protect the Indians from the injurious and nefarious liquor traffic, and the orders were temporary in their nature and could be withdrawn at any time and were withdrawn in 1879 and 1884.
The Sioux Indians took no interest which would entitle them to either legal or equitable relief. The petition is dismissed. It is so ordered.
Whitaker, Judge; Green, Judge; and Littleton, Judge, concur.