**TEKTRONIX INC.**

v.

**The UNITED STATES and the Hickok Electrical Instrument Co., Lavoie Laboratories, Inc., Jetronic Industries, Inc., Third-Party Defendants.**

No. 79–61.

United States Court of Claims.
Oct. 15, 1965.

Robert F. Conrad, Washington, D. C., attorney of record, for plaintiff. J. Russell Verbrycke, III, Washington, D. C., of counsel.

Michael W. Werth, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

John W. Meyer, Cleveland, Ohio, attorney for The Hickok Electrical Instrument Company; Einar G. Carlson and Richard J. Egan, Cleveland, Ohio, of counsel; Robert E. Burns, New York, N. Y., attorney for Lavoie Laboratories, Inc., Boris Haskell, Washington, D. C., attorney for Jetronic Industries, Inc., third party defendants.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COWEN, Chief Judge.

Plaintiff, a manufacturer of oscilloscopes, owns a number of United States patents covering circuitry and devices used in connection with oscilloscopes. Plaintiff filed in this court a petition alleging unauthorized manufacture or use by the defendant of certain of plaintiff's patented inventions.

In its amended answer, defendant included a counterclaim in which it alleged that the United States was the owner of

Chance patent No. 2,562,295, issued on July 31, 1951, and assigned to the United States as represented by the Secretary of War, and the Washburn patent No. 2,-594,104, issued on July 2, 1952, and assigned to the United States as represented by the Secretary of the Navy. The counterclaim further alleged that in the 6 years preceding November 23, 1962, plaintiff had used the inventions described in the Chance and Washburn patents without license or lawful right. By amendment, defendant's prayer for damages on its counterclaim was limited to the value of plaintiff's claim plus the value of a nonexclusive license (in futuro) for governmental purposes under the patents asserted by plaintiff against the defendant at any time in this action.

The Hickok Electrical Instrument Company, Lavoie Laboratories, Inc., and Jetronic Industries, Inc., were joined as third party defendants on the basis of allegations that they were suppliers to the government of oscilloscopes which infringed plaintiff's patents.

Plaintiff's motion for summary judgment, which seeks dismissal of defendant's counterclaim, raises a new and interesting question, because the counterclaim asserted by defendant is the first occasion on which the government has sought to bring an action against one of its citizens for infringement of a government patent. The defendant recognizes that there is no statute which specifically authorizes it to sue for infringement of its patents and that the general policy of the United States for more than 100 years has been to encourage the free, nonexclusive use of government patents by United States citizens. However, the defendant relies on the asserted general power of the Attorney General to sue for the misuse of government property and upon its contention that there was an established practice or policy with respect to the government-owned patents in issue.

Our study of the depositions and documents accompanying plaintiff's motion for summary judgment and defendant's

opposition thereto show that, during the period covered by the counterclaim and for a long time prior thereto, it was the established and publicly announced policy of the Departments of the Navy and the Army, which administered the patents in suit, to grant a nonexclusive, royalty-free license to any person who applied for one, or to permit any unlicensed user to freely use such patents without fear of being prosecuted for such infringement.

For the years prior to 1946, the policy of the Navy with respect to the public use of patents administered by it is set forth in Investigation of Government Patent Practices and Policies—Report and Recommendations of the Attorney General to the President, Vol. II, pp. 241–317 (1947). The summary of the report, hereinafter referred to as the Attorney General's Report, at pages 312 and 316, states:

> The [Navy] Department has never instituted suit for infringement of its patents nor does it make any checks in order to locate infringers.
>
> \* \* \* \* \*
>
> Since almost all of the Department's patent rights are in the form of licenses with title to the patents reposing in others, it has never had any real problem of patent administration. At the end of the last war it did purchase a fairly substantial block of communications patents from the Alien Property Custodian. These patents were cross-licensed freely to any applicant, but no attempt was made to prosecute infringers. The policy was never successful since companies such as RCA, which had a larger number of significant patents, never entered into any cross-licensing agreement and the only ones who did come in were the smaller companies with little to offer.

On April 19, 1961, Rear Admiral L. D. Coates, Chief of Naval Research, made the following statement before the Subcommittee on Patents, Trademarks, and

Copyrights of the Senate Judiciary Committee:

There has never been any indication that the Government had any desire to exercise its right to exclude its citizens from the use of Government-owned patents. On the contrary, the Attorney General has ruled that only revocable, nonexclusive licenses may be granted under Government-owned patents, and that the grant of an exclusive license would be a disposal of Government property requiring statutory authority (34 Op.Atty.Gen. 320).

While bills have been introduced in the Congress to provide the necessary authority, none has been enacted. In addition, the Chairman of the Government Patents Board has made known to the general public that Government-owned patents are available to all applicants on a royalty-free basis, and the Department of Justice has made public its policy of not enforcing Government-owned patents against any unlicensed user.

In view of the foregoing, it is readily understood why the Navy has so little information on the extent of use of Government-owned patented inventions. Anyone desiring to use a Government-owned invention may do so without fear of being prosecuted for infringement. Hearings Before the Subcommittee on Patents, Trademarks, and Copyrights of the Committee on the Judiciary, United States Senate, 87th Cong., 1st Sess., 1961, p. 81.

The policy of the Department of the Army with respect to the free and unlicensed use of patents administered by it is shown in the following statement on page 479 of the above-referred to Attorney General's Report:

\* \* \* Such licenses as were granted have been issued on a nonexclusive royalty-free basis. Since the Department has made no attempt to determine whether its patents are infringed, it may be assumed that patents have been used or can be used by other persons without requesting a license.

The continuation of that policy and procedure is exemplified in the following statement made by the Deputy Assistant Secretary of Defense before the Senate Subcommittee on Small Business:

As I stated earlier, we have title to 5,500 patents in inventions. They are available to the public. Any reputable person or firm can, upon application, receive a royalty-free, nonexclusive and revocable license to practice or use the invention. Practically speaking, they can use it without permission and run no real risk of the Government suit for the infringement. We have no economic interest such as income from royalties to protect. We are not in the business of selling patent licenses; a license to a Government-owned patent is relatively worthless since it does not afford the recipient investment protection on the basis of a right to exclude others. Hearings, Patent Policies of Departments and Agencies of the Federal Government, 86th Cong., 1st Sess., 1959, p. 344.

The evidence regarding the administration of the Army and Navy patents indicates that in most instances applications for the nonexclusive royalty-free licenses were made by those who expected to obtain special advantages therefrom, such as a desire to advertise that a product is manufactured under one or more licenses issued by the government. In that connection, the Deputy Attorney General testified before a special subcommittee of the House as follows:

This is true of course. Where, as you have in the case of government ownership, a policy by which anybody can use the invention royalty-free, the number of licensees doesn't give you any accurate count on the number of users. But the licensees, I think, do give you some indication of who is most interested, \* \* \* and to the extent there are license

applications, it does give you some positive indication that somebody is interested, although there may be others who are making a similar use without actually having applied for a license. Hearings, Patent Policies Relating to Aeronautic and Space Research, 87th Cong., 2d Sess., 1962, Part II, pp. 158–160.

There are other examples of expression of the free-use policy but the foregoing will suffice.

■ During the period of the alleged infringement, neither the Department of the Navy nor the Department of the Army published in the Federal Register any rules or regulations concerning the use of the government-owned patents involved here. The record is equally clear, however, that during the period pertinent to the counterclaim there were no statutes, regulations, or public statements of policy which contravened or limited the long-established policy with respect to such patents. Plaintiff's use of the Chance and Washburn patents was in accordance with and was authorized by that policy. Consequently, it is our opinion that the government's tacit approval of the unlicensed use of the patents in suit during the period of the alleged infringement granted to plaintiff an implied license, which precludes defendant from recovering on its counterclaim. The situation is analogous to the free use made of public lands prior to the enactment of statutes which authorized heads of departments to regulate the use of such lands. The government not only refrained from objecting to the use of the public domain but, in many ways, encouraged that use so that in time this privilege became, as the Supreme Court expressed it in Buford v. Houtz, 133 U.S. 320, 326, 10 S.Ct. 305, 307, 33 L.Ed. 618 (1890),

> * * * an implied license, growing out of the custom of nearly a hundred years, * * *.

The same principle was enunciated in Light v. United States, 220 U.S. 523, 535, 31 S.Ct. 485, 487, 55 L.Ed. 570 (1911):

> * * * And so, without passing a statute, or taking any affirmative

action on the subject, the United States suffered its public domain to be used for such purposes. There thus grew up a sort of implied license that these lands, thus left open, might be used so long as the Government did not cancel its tacit consent.

■ The defendant, however, asserts that its counterclaim is grounded upon an exception to the policy of free use in that the Washburn and Chance patents have at all times been treated specially. The basic weakness in this position is that there is nothing whatever in the record to indicate any different treatment or handling by the government of the Chance and Washburn patents until after the counterclaim in this case was filed. The first agreement involving the patents in issue was made with the Hickok Electrical Instrument Company and, although the defendant did not mention that fact in its brief, the record shows that the agreement was not executed until more than 4 months after the filing of defendant's counterclaim. Subsequently, license agreements were entered into among the government and the Hewlett-Packard Company, Lavoie Laboratories, and the Fairchild Camera & Instrument Corporation. Plaintiff argues that these agreements were part of a plan to help the government to defeat the claims of plaintiff, particularly the agreements made with Hickok and Lavoie, since these companies are apparently obligated to indemnify defendant if plaintiff is successful in its suit. We need not discuss this contention. Since no showing has been made of any special treatment of these patents during the period covered by the counterclaim, it is obvious that any subsequent special treatment does not establish the existence of the exception claimed by defendant during the previous pertinent period.

■ As its second defense to plaintiff's motion to dismiss the counterclaim, the defendant maintains that there was a recognized exception to the policy of free and unconditional use of government patents in cases where the dedication to the

public of an invention was not in the public interest. Defendant says that the exception applies to a concern which occupies a dominant position in an industry and is the principal beneficiary of such dedication. Defendant has offered evidence that plaintiff is the dominant company in the oscilloscope industry and claims that plaintiff has used the Chance and Washburn patents in conjunction with its own to increase its dominance in the field and to enlarge its profits. The basis for this position is supplied largely by the testimony of the government's expert witness, Professor Stedman, and by the conclusions which defendant draws from the Attorney General's Report. We do not doubt that Professor Stedman's opinions would be of much help to the Congress or to others interested in formulating a new government policy with respect to patents owned by it.[1] However, we do not regard his views as to the circumstances under which the government would be justified in departing from its established policy as a statement of the law applicable to the issue now before us. The statement from the 1947 Report of the Attorney General upon which defendant relies reads as follows:

It is conceivable that in an exceptional situation, the Government agency acquiring a patented invention may be convinced that controls should be retained over its use, and that such controls would be best imposed by licensing upon condition. An example frequently given is where the invention relates to the public health, and must be guarded against careless or improper use. Another conceivable example is where the public dedication of the invention will not *ipso facto* result in its widespread use and enjoyment but only in the aggrandizement of one company, such as a concern occupying a predominant position in an industry. That concern may be the only possible user of the Government invention because it owns the basic patents without which that invention is useless. For the Government to open its invention to the public may mean merely a free license to the dominant company,

---

[1]. In an article entitled "The U.S. Patent System: Its Current Problems," Professor Stedman wrote the following regarding government policy in administering its patents:

"To the extent that patent rights are retained by the government, the question arises as to how they should be administered. The four alternatives, any one of which might be proper depending upon the circumstances, appear to be: (1) general freedom in the public to use the inventions without restriction; (2) use of the patent rights, not to prevent use of the invention generally, but as a bargaining weapon in getting valuable concessions from others (e.g., to induce private contractors to permit government use of their own patents, to negotiate with foreign governments for use of inventions by their respective nationals, etc.); (3) grant of non-exclusive licenses at a reasonable royalty, thereby providing the government with some return from its research expenditures; and (4) where circumstances call for it, the grant of exclusive or partially-exclusive licenses to encourage the exploitation of inventions which might not otherwise be developed. (This last proposal might include an assured free 'shop right' to the contractor-inventor, in order to avoid situations in which the inventor who made an invention might be prevented from using it).

"Up to the present time, the first alternative is virtually the only policy that the government has followed. In most situations, this is probably the best. Granted that circumstances may arise in which one of the other approaches may be desirable in the public interest, this would require the government to make important and difficult policy decisions and to undertake burdensome administrative activities. For instance, it would have to decide who should get licenses, what the royalty rates and other licenses terms should be, etc. It would also have to enforce its patents against unlicensed users; otherwise, licenses would become meaningless. Consequently, a departure from the present uniform policy of non-enforcement of government-owned patents, would necessitate setting up a central government agency to administer them, since it would seem unwise to leave these important matters to the independent and uncoordinated discretion of the individual departments." 42 Texas L.Rev. 450, 492–493 (1964).

without a *quid pro quo*. The anomaly may be further pronounced if that company is charging substantial royalties to the Government for the use of similar inventions in the same field.

In such cases it might be well to license the Government invention rather than merely to dedicate it to the public, on conditions which will assure adequate use of the invention upon reasonable terms. The policing problem in this context is negligible, since there will be only one or a few users; but any administrative tasks created by such a license would seem to be justified by the protection it affords against the possibility of undue private advantage by one company from technology financed by the public.

Such cases should be reported by the head of the Government agency to the Government Patents Administrator, with a recommendation as to the conditions to be imposed, and if the Administrator finds that the public benefit from such conditions outweighs the objections to their use, he may authorize them, subject to reconsideration in the light of later experience. (Vol. I, pp. 125–126.)

It is apparent from examining the Attorney General's Report that the statement quoted above is a recital of circumstances under which recommendations might be made for the conditional licensing of government-owned patents. The statement was followed with the recommendations of the Attorney General, including the following:

1. As a basic policy, all Government-owned inventions should be made fully, freely and unconditionally available to industry, science and the public. This should be done either by offering royalty-free, non-exclusive licenses to all applicants, or by public dedication of the invention.

Furthermore, there is no showing in the record that during the period of the alleged infringement, any report or recommendation was made regarding the use of the patents in issue or that any conditions were imposed on such use.

Our conclusion regarding the nonexistence of the policy exceptions claimed by defendant is fortified by the deposition of Captain J. C. Davis, Assistant Chief, Office of Naval Research for Patents. He testified that the defendant's counterclaim was not filed as a result of the Navy's policy respecting government-owned patents. He also stated that he was unaware of any statute, rule, regulation, policy or practice of the Navy Department that was inconsistent with Admiral Coates' statement regarding the use of a government-owned patent by anyone without fear of prosecution for infringement.

We need not question nor explore at length the authority of the Attorney General to safeguard or enforce the property rights of the United States. Upon the record before us, we are satisfied that the implied license held by plaintiff could not be revoked retroactively so as to create a liability where none existed before. We think such a conclusion is implicit in the following language of the Supreme Court in United States v. Grimaud, 220 U.S. 506, 521, 31 S.Ct. 480, 485, 55 L.Ed. 563 (1911):

> * * * Thus the implied license under which the United States had suffered its public domain to be used as a pasture for sheep and cattle, mentioned in Buford v. Houtz, 133 U.S. 326 [10 S.Ct. 305, 33 L.Ed. 618] was curtailed and qualified by Congress, to the extent that such privilege should not be exercised in contravention of the rules and regulations. Wilcox v. Jackson ex dem. McConnel, 13 Pet. 498, 513 [10 L.Ed. 264].
>
> If, after the passage of the act and the promulgation of the rule, the defendants drove and grazed their sheep upon the reserve, in violation of the regulations, they were making an unlawful use of the government's property. In doing so they thereby

made themselves liable to the penalty imposed by Congress.

Finding as we do that defendant's counterclaim should be dismissed for the reasons stated above, we need not and do not reach the remaining questions raised in the briefs of the parties.

Plaintiff's motion for summary judgment is granted and defendant's counterclaim is dismissed. The case is remanded to the trial commissioner for trial upon the issues presented in plaintiff's petition and defendant's answer.